ORIGINAL

AO 93  (Rev. 12/09) Search and Seizure Warrant   (USAO CDCA Rev. 01/2013)

# UNITED STATES DISTRICT COURT
for the
Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br>A Blackberry Curve, bearing pin #2BE49485 | )<br>)   Case No.   **16-0153M**<br>)<br>)<br>) |

## SEARCH AND SEIZURE WARRANT

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____Central_____ District of _____California_____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A

The person or property to be searched, described above, is believed to conceal *(identify the person or describe the property to be seized)*:

See Attachment B

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property.  Such affidavit(s) or testimony are incorporated herein by reference and attached hereto.

**YOU ARE COMMANDED** to execute this warrant on or before _____14 days from the date of its issuance_____
                                                                                *(not to exceed 14 days)*
☑ in the daytime  6:00 a.m. to 10 p.m.     ☐ at any time in the day or night as I find reasonable cause has been
                                                                        established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to United States Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.
                                *(name)*

☐ I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)* ☐ for _____ days *(not to exceed 30)*.
                                                                        ☐ until, the facts justifying, the later specific date of _____

Date and time issued:   *1-22-16  2:15*             _____
                                                                                        *Judge's signature*

City and state:   Los Angeles, California            Frederick F. Mumm, U.S. Magistrate Judge
                                                                                *Printed name and title*

AUSA: Jeffrey Chemerinsky (X16520)

AO 93  (Rev. 12/09) Search and Seizure Warrant (Page 2)

| Return | | |
|---|---|---|
| Case No.: <br> 16 - 0153M | Date and time warrant executed: <br> 1/25/16   12:00pm | Copy of warrant and inventory left with: <br> N/A |
| Inventory made in the presence of : | | |

Inventory of the property taken and name of any person(s) seized:

[Please provide a description that would be sufficient to demonstrate that the items seized fall within the items authorized to be seized pursuant to the warrant (e.g., type of documents, as opposed to "miscellaneous documents") as well as the approximate volume of any documents seized (e.g., number of boxes). If reference is made to an attached description of property, specify the number of pages to the attachment and any case number appearing thereon.]

- 317 photos documenting surveillance activity
- blackberry messages between user of blackberry and "CABE", and user of blackberry and "Coro."

**Certification** (by officer present during the execution of the warrant)

I declare under penalty of perjury that I am an officer who executed this warrant and that this inventory is correct and was returned along with the original warrant to the designated judge through a filing with the Clerk's Office.

Date: 3/23/2016

_____
Executing officer's signature

SA Jessica Salo
_____
Printed name and title

AUSA: Jeffrey Chemerinsky (X16520)

## ATTACHMENT A

PROPERTY TO BE SEARCHED

The following digital devices (the "SUBJECT DEVICES"), seized on January 9, 2016, and currently maintained in the custody of the Federal Bureau of Investigation in Long Beach, California:

a.      a Blackberry Curve, bearing pin #2BE49485

INSTRUMENTALITY PROTOCOL

## ATTACHMENT B

### I.    ITEMS TO BE SEIZED

1.    All records relating to violations of 18 U.S.C. § 2261A (stalking) and 18 U.S.C. § 371 (conspiracy to commit stalking), those violations involving Alfredo Ramirez-Saldana, Blanca Carolina Diaz, and Carlos Rubio-Parra (the "SUBJECTS") occurring between July 1, 2015 and January 9, 2016 namely:

    a.    Communications relating to ongoing surveillance of Victim #1, Victim #1 family, Victim #1's friends, and Victim #1's family members' friends;

    b.    Communications regarding instructions to contact, harm, injure, or kill Victim #1, Victim #1 family, Victim #1's friends, and Victim #1's family members' friends;

    c.    Communications and documents regarding money exchanged between the SUBJECTS;

    d.    Evidence of photographs of Victim #1, Victim #1 family, Victim #1's friends, and Victim #1's family members' friends;

    e.    Maps, directions, documents, and programs showing locations or movements of Victim #1, Victim #1 family, Victim #1's friends, and Victim #1's family members' friends;

    f.    Evidence of weapons possessed;

    g.    Evidence of additional conspirators and their identities;

    h.    Evidence of locations of the SUBJECTS during the relevant time period;

    i.    Evidence of intent to harm, harass, injure, or intimidate, Victim #1, Victim #1 family, Victim #1's friends, and Victim #1's family members' friends;

    j.    Any SUBJECT DEVICE used to facilitate the above-listed violations (and forensic copies thereof);

INSTRUMENTALITY PROTOCOL

2.       With respect to any SUBJECT DEVICE used to facilitate the above-listed violations or containing evidence falling within the scope of the foregoing categories of items to be seized:

a.       evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

b.       evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.       evidence of the attachment of other devices;

d.       evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.       evidence of the times the device was used;

f.       passwords, encryption keys, and other access devices that may be necessary to access the device;

g.       applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

h.       records of or information about Internet Protocol addresses used by the device;

i.       records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

## II.    SEARCH PROCEDURE FOR DIGITAL DEVICE(S)

2

INSTRUMENTALITY PROTOCOL

3.     In searching the SUBJECT DEVICE(S) (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.     Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.     The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.     The search team shall complete the search of the SUBJECT DEVICES as soon as is practicable but not to exceed 60 days from the date of issuance of the warrant. If additional time is needed, the government may seek an extension of this time period from the Court on or before the date by which the search was to have been completed.

d.     The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.     The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.     The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

e.     The search team shall make and retain notes regarding its search of the SUBJECT DEVICE(S).

f.     If the search team, while searching a SUBJECT DEVICE, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to

3

INSTRUMENTALITY PROTOCOL

be seized, the team shall immediately discontinue its search of that SUBJECT DEVICE pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

g.    If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

h.    If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

i.    If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of items to be seized, the government may retain forensic copies of the SUBJECT DEVICE but may not access them (after the time for searching the device has expired) absent further court order.

j.    The government may retain a SUBJECT DEVICE itself until further order of the Court or one year after the conclusion of the criminal investigation or case (whichever is latest), only if the SUBJECT DEVICE is determined to be an instrumentality of an offense under investigation or the government, within 14 days following the time period authorized by the Court for completing the search, obtains an order from the Court authorizing retention of the SUBJECT DEVICE (or while an application for such an order is pending).  Otherwise, the government must return the SUBJECT DEVICE.

k.    Notwithstanding the above, after the completion of the search of the SUBJECT DEVICE(S), the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4.    The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

INSTRUMENTALITY PROTOCOL

## AFFIDAVIT

I, Matthew Parker, being duly sworn, declare and state as follows:

### I.    INTRODUCTION

1.      I am a Special Agent ("SA") with the Federal Bureau of Investigation (the "FBI"), and have been so employed since June 2001. I have been assigned to several types of squads over the course of my career including squads responsible for the investigation of organized crime groups and violent gangs. I am currently assigned to the Violent Crimes Squad and the Long Beach Resident Agency ("LBRA"). As a SA, I have participated in numerous federal and state investigations involving violent crimes, to include but not limited to extortion, kidnapping, murder, and murder for hire. Through my participation in these investigations, I have debriefed numerous defendants, confidential informants, cooperating sources, and witnesses with personal knowledge regarding various violent crime violations. I have conducted hundreds of hours of surveillance in support of my investigations. I have also utilized global positioning system ("GPS") tracking devices in support of these surveillance investigations. I am familiar with the installation and operation of GPS tracking devices in how they relate to surveillance activity.

### II.    PURPOSE OF AFFIDAVIT

2.      This affidavit is made in support of an application for a warrant to search the following digital devices:

        a.      a Blackberry Curve, bearing pin #2BE49485 ("SUBJECT DEVICE 1");

        b.      an iPhone 5 Model, A1428, bearing IMEI: 013330000467866 ("SUBJECT DEVICE 2" and, collectively, the "SUBJECT DEVICES").

3.      The requested search warrant seeks authorization to seize any data on the SUBJECT DEVICES that constitutes evidence or fruits of violations of 18 U.S.C. § 2261A (stalking) and 18 U.S.C. § 371 (conspiracy to commit stalking) (collectively, the "Subject Offenses"), or any SUBJECT DEVICE that is itself an instrumentality of the Subject Offenses.

INSTRUMENTALITY PROTOCOL

4.      The SUBJECT DEVICES are identified in Attachment A to the search warrant application. The list of items to be seized is set forth in Attachment B to the search warrant application. Attachments A and B are incorporated herein by reference.

5.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is submitted solely for the purpose of establishing probable cause and does not purport to set forth all of my knowledge of, or investigation into, the offense. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.  SUMMARY OF PROBABLE CAUSE

6.      As set forth below, criminal complaints have been filed against defendant ALFREDO RAMIREZ-SALDANA ("SALDANA") and BLANCA CAROLINA DIAZ ("DIAZ") for interstate stalking, in violation of 18 U.S.C. § 2261A(1). The complaints allege and set forth facts showing that RAMIREZ-SALDANA and DIAZ were working on behalf of CARLOS RUBIO-PARRA ("RUBIO-PARRA"), a known Guatemalan-based drug distributor, to track the locations and movements of RUBIO-PARRA's ex-wife (Victim #1) and ex-wife's family and friends. Through the use of wiretaps, the investigation revealed that RAMIREZ-SALDANA communicated extensively using SUBJECT DEVICE 1 with RUBIO-PARRA regarding this surveillance. In addition, the investigation revealed that RAMIREZ-SALDANA and DIAZ utilized sophisticated surveillance tactics such as GPS trackers and renting an apartment unit directly across from where the victim family lived.

7.      This warrant seeks authorization to search the two digital devices found on RAMIREZ-SALDANA at the time of his arrest.

2

INSTRUMENTALITY PROTOCOL

## IV.  STATEMENT OF PROBABLE CAUSE

**A.    Background Leading to the Arrest of RAMIREZ-SALDANA**

    1.    Background

8.      Since December 12, 2015, I have been in contact with SAs from the Drug Enforcement Agency ("DEA") regarding their investigation of Carlos Rubio-Parra and RAMIREZ-SALDANA. I have learned from DEA SAs in New York and Chicago, that Rubio-Parra is a high-level narcotics trafficker based out of Central America. On October 29, 2012, Guatemala issued an Interpol "Red Notice" for RUBIO-PARRA. According to the Red Notice, from July 10, 2010, to September 28, 2012, RUBIO-PARRA was the leader of a violent criminal organization. RUBIO-PARRA is credited with the murder and attempted murder of at least fifteen men and women. According to news reports, at least some of the victims of these murders and attempted murders were associates of RUBIO-PARRA'S ex-wife.

9.      I have learned from DEA SAs that RAMIREZ-SALDANA, also known as "Tony," is acting under the instruction of RUBIO-PARRA. On a 2014 United States Visa Application, RAMIREZ-SALDANA listed the occupation of Police Officer and an employer of Secretaria Seguridad Publica San Pedro Tlaquepaque, which I interpret to mean that he is a Mexican police officer.

10.      Based on conversations and text messages intercepted in the last few months pursuant to a federal wiretap, RUBIO-PARRA was directing RAMIREZ-SALDANA to conduct active surveillance in the Los Angeles area on Victim # 1 and six additional victims who are associated with Victim # 1. The wiretap intercepts revealed that RAMIREZ-SALDANA was using a Blackberry, with pin #2BE49485. This is the same pin number contained on the exterior of SUBJECT DEVICE 1, which was found at the time of RAMIREZ-SALDANA's arrest.

11.      I have interviewed Victim # 1 regarding RUBIO-PARRA and RAMIREZ-SALDANA. Until informed by law enforcement, Victim # 1 was unaware of the identity and actions of RAMIREZ-SALDANA. In mid-December 2015, based on information learned from intercepted telephone conversations and text messages discussed above, the DEA informed

3

INSTRUMENTALITY PROTOCOL

Victim # 1 of RAMIREZ-SALDANA and RUBIO-PARRA'S conversation and their actions taken to secretly track the activities of Victim # 1 and her associates. Based on the information learned from the intercepted telephone conversations between RAMIREZ-SALDANA and RUBIO-PARRA, Victim # 1 and her associates have been placed in a safe location that is not associated with her residence at the Sherwood Apartments in Bellflower, California. Victim # 1 was a witness related to criminal charges against RUBIO-PARRA in Guatemala. Based on her previous experiences with RUBIO-PARRA, Victim # 1 is in fear for her life. The stalking actions taken by RAMIREZ-SALDANA and RUBIO-PARRA are causing her great emotional stress and have caused her to remain in fear for her life and the safety of those associated with her.

12.     Based on the information learned from intercepted telephone conversations between RAMIREZ-SALDANA, on SUBJECT DEVICE 1, and RUBIO-PARRA, Victim # 1's associates have also been placed in a safe location that is not associated with her residence at the Sherwood Apartments in Bellflower, California. I have interviewed the associates of Victim # 1. The stalking actions taken by RAMIREZ-SALDANA and RUBIO-PARRA are causing the associates of Victim # 1 great emotional stress and have caused them to remain in fear for their lives.

13.     On January 9, 2016, I swore out a criminal complaint affidavit before Hon. Patrick J. Walsh against RAMIREZ-SALDANA alleging a violation of 18 U.S.C. § 2261A(1) (stalking). On that same date, RAMIREZ-SALDANA appeared for his initial appearance before Judge Walsh and was ordered detained. On January 19, 2016, I swore out a criminal complaint affidavit before Hon. Frederick F. Mumm against DIAZ, alleging a violation of 18 U.S.C. § 2261A(1) (stalking). On that same date, DIAZ appeared for her initial appearance before Judge Mumm and was ordered detained.

2.     RAMIREZ-SALDANA Travels to Los Angeles

14.     Based on information I learned from the DEA wiretap investigation, and my own surveillance in the Central District of California from November 2015 through the present,

4

INSTRUMENTALITY PROTOCOL

RAMIREZ-SALDANA has traveled from Mexico to Los Angeles, California, on at least three occasions to conduct surveillance on Victim # 1 and six additional victims associated with Victim # 1.

15.     DEA Chicago provided me with summaries of intercepted telephone conversations and text messages that show RAMIREZ-SALDANA is being directed by RUBIO-PARRA. RUBIO-PARRA instructed RAMIREZ-SALDANA to locate and follow Victim # 1 and her associates. RAMIREZ-SALDANA'S surveillance has included stationary and mobile surveillance of all seven victims.   During the conversation, RUBIO-PARRA instructs RAMIREZ-SALDANA on the purchase, installation, removal, and operation of the GPS tracking devices. RAMIREZ-SALDANA and RUBIO-PARRA also discuss being cautious in the installation and removal of the GPS tracking devices. RUBIO-PARRA advises RAMIREZ-SALDANA to not get caught being recorded by any surveillance cameras. Conversations also coincide with active surveillance being conducted by RAMIREZ-SALDANA. During the conversation, RAMIREZ-SALDANA reports to RUBIO-PARRA that he was currently watching the vehicle of Victim #1. RAMIREZ-SALDANA took photographs of Victim # 1's vehicle and forwarded the photographs to RUBIO-PARRA. The Blackberry phone used by RAMIREZ-SALDANA on the wiretap contains the exact same unique pin number as the Blackberry found at the time of RAMIREZ-SALDANA's arrest.

16.     I accessed a government database that documents international traveler entry into the United States, and learned that on January 3, 2016, RAMIREZ-SALDANA traveled from Mexico to Los Angeles, California. I believe that the purpose of RAMIREZ-SALDANA's travel was to search for Victim #1 and her associates.

17.     Beginning on January 3, 2016, through January 9, 2016, I coordinated investigation and surveillance of RAMIREZ-SALDANA and his associates in their attempts to locate Victim # 1 and her associates.

18.     Along with other law enforcement personnel, I observed RAMIREZ-SALDANA arrive at Los Angeles International Airport ("LAX") on January 3, 2016. I was informed by SA

5

INSTRUMENTALITY PROTOCOL

David Gates that RAMIREZ-SALDANA was selected for a secondary search by a United States Customs Officer. RAMIREZ-SALDANA stated that the purpose of his travel to the United States was to purchase baby clothing for his wife, who was eight months pregnant.

19.     RAMIREZ-SALDANA then rented a vehicle from a rental car agency near LAX. RAMIREZ-SALDANA drove to the Baymont Inn and Suites in Lawndale, California. As discussed below, it was later learned that RAMIREZ-SALDANA met with BLANCA CAROLINA DIAZ in this hotel to retrieve GPS tracking devices.

20.     I observed RAMIREZ-SALDANA depart the Baymont Inn and Suites and travel to the Sherwood Apartments in Bellflower, California (where Victim #1 previously resided). RAMIREZ-SALDANA was seen driving around the gated apartment property several times before entering the property. RAMIREZ-SALDANA exited the property and departed the area at a high speed.

            3.   <u>Tracking Devices</u>

21.     Based on information provided by the DEA in Chicago and my own personal experience, I know that RAMIREZ-SALDANA and others have used several GPS tracking devices to track Victim # 1 and her associates.

22.     On January 6, 2016, FBI SAs conducted a search of the exterior of Victim # 1's vehicle. A GPS tracking device was discovered on the underside of Victim # 1's vehicle. The device was labeled Silver Cloud TAG Serial Number 8880422728.

23.     On January 7, 2016, FBI SAs conducted a search of the exterior of a vehicle of an individual who is only loosely associated with Victim # 1. A GPS tracking device was discovered on the underside of that vehicle. The device was labeled Silver Cloud TAG Serial Number 8880422727.

24.     I conducted an internet search to determine the type of GPS devices that were discovered. The GPS devices are part of a system owned and operated by a company named LandAirSea that is based out of Woodstock, Illinois. I have sent subpoenas to LandAirSea and have learned that the Contact/Activation Information of the account is listed as VALENTINA

INSTRUMENTALITY PROTOCOL

PARADA. The account listed three Silver Cloud TAG GPS tracking devices that were active for this account. The serial numbers for the GPS tracking devices were listed as follows: 8880422670, 8880422727, and 8880422728.

25.    LandAirSea also provided tracking logs for the account. From the subpoenas to the company and based on the recovery of previously described items, I learned that RAMIREZ-SALDANA and RUBIO-PARRA used a website owned and operated by LandAirSea to track the location and movement of the victims.

26.    Through my investigation I learned that RAMIREZ-SALDANA surreptitiously installed tracking devices on two vehicles that belonged to the victims. RAMIREZ-SALDANA used the GPS software to follow and locate the vehicles. I inspected two vehicles, including Victim #1's vehicle, and discovered the LandAirSea GPS devices that had been secreted on the underside of the vehicles. The GPS tracking devices were placed in weatherproof magnetic cases and installed on the exterior of the vehicles.

27.    Based on information provided by the DEA in Chicago and my own personal experience, I know that RAMIREZ-SALDANA and RUBIO-PARRA used the LandAirSea internet based interface of the GPS tracking software to coordinate RAMIREZ-SALDANA's surveillance of the victims. RAMIREZ-SALDANA conducted surveillance of the victims all hours of the day and night. Surveillance locations included, but were not limited to, the victim' residences and places of employment.

    4.    Recent Surveillance

28.    Along with other law enforcement personnel, I observed RAMIREZ-SALDANA conduct several surveillance operations during the week of January 4, 2016, to check on the location of the vehicles on which the tracking devices had been placed. Based on information I learned from DEA telephone intercepted conversations, I know that RAMIREZ-SALDANA was using this in an effort to locate Victim # 1 and her associates.

29.    To determine if RAMIREZ-SALDANA was following the vehicles, I obtained Victim #1's permission to move the vehicles around Los Angeles. On January 9, 2016, I placed

7

INSTRUMENTALITY PROTOCOL

Victim #1's vehicle at the Sea Bright Hotel, which is located in a secluded part of Long Beach, California. At approximately 4:55 p.m., RAMIREZ-SALDANA, arrived in the vicinity of the Sea Bright Hotel, driving a red Volkswagen Jetta. I saw RAMIREZ-SALDANA arrive at the location of Victim #1's vehicle. I believe that he was only able to locate the vehicle because he was utilizing the GPS device, that was affixed to the vehicle, especially since the location of the vehicle had no relationship to prior locations used by the victims. At approximately 5:12 p.m., RAMIREZ-SALDANA exited the Jetta and entered the passenger side of a white Hyundai. I saw the Hyundai enter the parking lot of the Sea Bright Hotel. As the white Hyundai was exiting the parking lot of the Sea Bright Hotel, Police Officers of the Long Beach Police Department stopped the white Hyundai and took RAMIREZ-SALDANA and the female driver of the Hyundai into custody.

30.    Based on my training and experience, I know that individuals who are involved in these types of surveillance operations are doing so because they want to learn a pattern of life of the victims. The individuals will use this surveillance information to find an opportunity to cause stress, intimidation, or physical harm to the victims.

31.    Based on the fact that RUBIO-PARRA is believed to have ordered the murders of individuals associated with Victim #1 in the past, I believe his actions taken to conduct surveillance of Victim #1 and her associates is for the purpose of either harassing, intimidating, or possibly injuring Victim #1 or her associates.

**B.    DIAZ's Statements**

1.    Interview on January 9, 2016

32.    On January 9, 2016, I subsequently interviewed the female driver of the white Hyundai, who was identified as BLANCA CAROLINA DIAZ. DIAZ, while in the custody of the Long Beach Police Department, was advised of her *Miranda* rights. DIAZ stated that she understood her rights and agreed to waive her rights and answer questions. During this interview stated the following:

8

a.    She was instructed by David Monzon RUBIO-PARRA ("Monzon"), who is RUBIO-PARRA's nephew, and RAMIREZ-SALDANA to manage the GPS tracking devices, live monitor the GPS trackers, and take notes on the various locations, individuals, and vehicles that RAMIREZ-SALDANA was surveilling.

b.    She maintained detailed notes in a folder, which she provided to me. The folder contained photographs, addresses, and information about the victims, their residences, and their vehicles. The photographs in DIAZ's possession were surreptitiously taken by RAMIREZ-SALDANA at the Sherwood Apartments in Bellflower, California (the residence of Victim #1).

c.    DIAZ stated that, in early December 2015, at the direction of RAMIREZ-SALDANA, RUBIO-PARRA, and Monzon, DIAZ purchased approximately five GPS trackers from a business named The Spy Shop in Sherman Oaks, California.

d.    I showed DIAZ a California Department of Motor Vehicles photograph of Elvin Ricardo Rivas. DIAZ identified the person in the photograph as "Elvin." DIAZ stated that RAMIREZ-SALDANA and RIVAS rented an apartment at the Sherwood Apartments, Bellflower, California (the community in which Victim # 1 previously resided) for the purpose of watching Victim #1's apartment. DIAZ had visited the apartment rented by RAMIREZ-SALDANA in mid-December 2015. RAMIREZ-SALDANA showed DIAZ how he was able to watch Victim #1's apartment from the apartment he rented. RAMIREZ-SALDANA informed DIAZ that the reason that apartment had been rented was to watch the victims.

33.    On January 13, 2016 I interviewed DIAZ after she had been released from state custody. During this interview, I learned the following:

a.    In July 2015, Monzon and RUBIO-PARRA asked DIAZ to assist them in finding the victims after the victims were located in Lomita, California. The victims were quickly "lost" again but were located by RUBIO-PARRA in Fall 2015. In October 2015, under the instruction of RUBIO-PARRA, DIAZ worked with RIVAS to rent an apartment in the same complex as Victim #1 and her family. Two apartments had been available at the time DIAZ was

9

INSTRUMENTALITY PROTOCOL

attempting to rent an apartment, but RUBIO-PARRA had asked DIAZ to rent an apartment near Victim #1.

      b.     DIAZ has regular communication with RUBIO-PARRA, Monzon, and RAMIREZ-SALDANA using a Blackberry application on her phone. Monzon is named "Cabe," RUBIO-PARRA is named "John Smith," and RAMIREZ-SALDANA is named "Tony" in her Blackberry contacts. These names were selected by Monzon, RUBIO-PARRA, and RAMIREZ-SALDANA, not by DIAZ.

      c.     DIAZ set up an account with the GPS company LandAirSea for three of the GPS trackers she purchased in December 2015. The account was named "Valentina Parada" with username ValentinaParada2015, which DIAZ had selected. RUBIO-PARRA and Monzon had told DIAZ not to use her true name when activating the GPS trackers with LandAirSea. DIAZ pays for the account with prepaid credit cards using cash that RAMIREZ-SALDANA provided her. DIAZ only uses her iPhone for monitoring the trackers and regularly monitors these GPS trackers, using the SilverCloud application.[1] The SilverCloud application is LandAirSea's mobile application.

      d.     DIAZ was aware of another account of GPS trackers that either Monzon or RAMIREZ-SALDANA had set up with LandAirSea named "Mario Lopez." The username was MarioLopez2608. There were approximately four GPS trackers associated with this account. This account was inactive as DIAZ had not recently paid for the account. The "Mario Lopez" account had previously been monitored using the SilverCloud application on a separate iPhone from the "Valentina Parada" account.

      e.     In December 2015, RAMIREZ-SALDANA provided DIAZ $20,000 which DIAZ was to pass to Monzon and keep $3,000 for herself. The money was for Monzon to pay for expenses while Monzon and several other RUBIO-PARRA's family members were in

---

[1] DIAZ provided consent to search her phones. The search of her iPhone revealed the SilverCloud application downloaded on the phone.

INSTRUMENTALITY PROTOCOL

Los Angeles in mid-December 2015.  Monzon and RUBIO-PARRA had also given DIAZ money to assist DIAZ with her medical treatments.

    f.  On Saturday, January 9, 2016, RUBIO-PARRA texted DIAZ and asked her to check the location of Victim # 1's vehicle, which was then located at the Sea Bright hotel in Long Beach.  DIAZ explained that RUBIO-PARRA also had the log-ins and passwords to the GPS accounts.  DIAZ texted RAMIREZ-SALDANA the location of the hotel and drove to the hotel to meet RAMIREZ-SALDANA there.  Once RAMIREZ-SALDANA arrived, RAMIREZ-SALDANA entered the passenger side of DIAZ's vehicle and told DIAZ to drive into the hotel parking lot to check for Victim # 1's vehicle.  As they were exiting the hotel parking lot, RAMIREZ-SALDANA saw the police and began to "freak out."

  **C.**  **Probable Cause to Search the SUBJECT DEVICES**

  34.  As set forth above, the SUBJECT DEVICES were found on the passenger seat (which RAMIREZ-SALDANA was seated in) of the white Hyundai at the time of RAMIREZ-SALDANA's arrest.  My comparison of the pin number on the exterior of SUBJECT DEVICE 1 (the Blackberry) matched the pin number used by RAMIREZ-SALDANA on the Blackberry on the wiretap calls with RUBIO-PARRA.

  35.  Based the wiretap conversations, it is clear that members RAMIREZ-SALDANA used his cell phone to communicate with RUBIO-PARRA during his surveillance of the victims.  The wiretaps show that RAMIREZ-SALDANA used his cell phone to send text messages and photographs to RUBIO-PARRA.  Thus, the search of these digital devices may further reveal communications between RAMIREZ-SALDANA and RUBIO PARRA, as well as with other members of the conspiracy.

  36.  In addition, based on the search of DIAZ's phone and DIAZ's statements, it is clear that DIAZ used an application on her iPhone to monitor the movements of the victims.  Based on RAMIREZ-SALDANA's statements captured on the wiretap and movements seen by FBI surveillance, it is clear he also was following the GPS tracking device movements.  Thus, it is likely that the search of his iPhone may also reveal a similar application.

11

INSTRUMENTALITY PROTOCOL

37.    Based on training and experience, I know that individuals frequently use their phones to communicate with one another.

38.    In addition, the search of RAMIREZ-SALDANA's phone may help law enforcement determine RAMIREZ-SALDANA's precise movements and action in furtherance of the conspiracy.

## V.    TRAINING AND EXPERIENCE ON DIGITAL DEVICES

39.    Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in the forensic examination of digital devices, I know that it is not always possible to search digital devices for digital data in a single day or even over several weeks for a number of reasons, including the following:

c.    Searching digital devices can be a highly technical process that requires specific expertise and specialized equipment. There are so many types of digital devices and software programs in use today that it takes time to conduct a thorough search. In addition, it may be necessary to consult with specially trained personnel who have specific expertise in the type of digital device, operating system, and software application being searched.

d.    Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is essential to conducting a complete and accurate analysis of data stored on digital devices.

e.    A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text.

f.    Electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a hard drive, deleted, or viewed via the Internet. Electronic files saved to a hard drive can be stored for years with little or no cost. Even when

12
INSTRUMENTALITY PROTOCOL

such files have been deleted, they can be recovered months or years later using readily-available forensics tools. Normally, when a person deletes a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the hard drive until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space, i.e., space on a hard drive that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space, for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a swap or recovery file. Similarly, files that have been viewed on the Internet are often automatically downloaded into a temporary directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently downloaded or viewed content. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits. Recovery of residue of electronic files from a hard drive requires specialized tools and a controlled laboratory environment. Recovery also can require substantial time.

g.     Although some of the records called for by this warrant might be found in the form of user-generated documents (such as word processing, picture, and movie files), digital devices can contain other forms of electronic evidence as well. In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications and materials contained on the digital devices are, as described further in the attachments, called for by this warrant. Those records will not always be found in digital data that is neatly segregable from the hard drive image as a whole. Digital data on the hard drive not currently associated with any file can provide evidence of a file that was once on the hard drive but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave digital data on the hard drive that show what tasks and processes on the computer were recently used. Web browsers, e-mail

13

INSTRUMENTALITY PROTOCOL

programs, and chat programs often store configuration data on the hard drive that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times the computer was in use. Computer file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

       h.     Further, evidence of how a digital device has been used, what it has been used for, and who has used it, may be the absence of particular data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of particular data on a digital device is not segregable from the digital device. Analysis of the digital device as a whole to demonstrate the absence of particular data requires specialized tools and a controlled laboratory environment, and can require substantial time.

       i.     Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or

14

INSTRUMENTALITY PROTOCOL

alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband or instrumentalities of a crime.

2.      Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI.  CONCLUSION

3.      For the reasons described above, I respectfully submit there is probable cause to believe that evidence, fruits, and instrumentalities of the Subject Offenses will be found on the SUBJECT DEVICES.

Matthew Parker, Special Agent
Federal Bureau of Investigation


Subscribed to and sworn before me
this 22 day of January, 2016.


HONORABLE FREDERICK F. MUMM
UNITED STATES MAGISTRATE JUDGE

INSTRUMENTALITY PROTOCOL